IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| AMERICAN CONSERVATIVE UNION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:24-cv-500 (RDA/LRV) |
| INSTITUTE FOR LEGISLATIVE ANALYSIS, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the Joint Motion to Dismiss the First Amended Complaint. Dkt. 19 (the "Motion"). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with the Memorandum in Support (Dkt. 20), Plaintiffs' Opposition (Dkt. 24), and Defendants' Reply (Dkt. 25), the Court GRANTS IN PART and DENIES IN PART the Motion for the reasons that follow.

### I.  BACKGROUND

#### A.  Factual Background[1]

Plaintiffs in this action are the American Conservative Union ("ACU") and the American Conservative Union Foundation ("ACUF"). Dkt. 15 at 1. Plaintiffs have brought this suit against former employees – Defendants Ryan McGowan, Frederick McGrath, Bryan Axler, Zoe Reese,

---

[1] For purposes of considering the instant Motions to Dismiss, the Court accepts all facts contained within the Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

and Francis Finnegan[2] – who Plaintiffs allege misappropriated Plaintiffs' trade secret information to create Defendant Institute for Legislative Analysis ("ILA").[3]  Dkt. 15 ¶ 1.  ILA was incorporated on March 16, 2023.  *Id.* ¶ 8.

ACU is a 26 U.S.C. § 501(c)(4) non-profit organization that "serves to unite and mobilize conservatives around the tenants of conservatism, through various events, trainings, and policy forums around the country."  *Id.* ¶ 6.  ACUF is a 26 U.S.C. § 501(c)(3) non-profit organization that "serves to educate citizens about conservative principles."  *Id.* ¶ 7.  Together, Plaintiffs host the Conservative Political Action Conference also known as "CPAC."  *Id.* ¶ 21.  ACUF, through its Center for Legislative Accountability, issues ratings of state and federal lawmakers based on their voting records.  *Id.*  To do so, they use a 50-state comprehensive scorecard for legislators. *Id.* ¶ 22.

Plaintiffs use their own "methods, methodologies, and algorithms for rating public officials" and such tools are not publicly known.  *Id.* ¶ 23.  These methods, methodologies, and algorithms include how each legislator is assessed, how voting records are considered, and the bills each legislator sponsors.  *Id.* ¶ 24.  These methods have enhanced and developed Plaintiffs' donor base.  *Id.* ¶ 25.

Plaintiffs require all employees to review and execute non-disclosure and confidentiality agreements (the "Agreements").  *Id.* ¶ 26.  Plaintiffs also have various written policies (the "Policies"), which are provided to all employees, to safeguard their confidential information.  *Id.* Included in the Policies is a restriction forbidding employees from disclosing confidential information outside of Plaintiffs without authorization and from using Plaintiffs' work product for

---

[2] Collectively, these defendants will be referred to as the "Individual Defendants."

[3] Together, ILA and the Individual Defendants will be referred to as the "Defendants."

purposes not related to Plaintiffs. *Id.* ¶ 27. The Agreements provide: (i) that an employee's access to and use of confidential information is only for the purpose of their employment; (ii) that an employee is not to disclose confidential information without Plaintiffs' written consent; (iii) that an employee has a duty to protect Plaintiffs' confidential information from unauthorized disclosure; (iv) confidential information remains Plaintiffs' property; and (v) upon termination, an employee agrees to return or destroy all confidential information belonging to Plaintiffs. *Id.* ¶ 29.

On December 4, 2018, ACU filed a trademark application with the United States Patent and Trademark Office (the "USPTO") for its "Star Mark," which Plaintiffs depict on their scorecards so that they are recognizable. *Id.* ¶ 31. The USPTO approved and registered the Star Mark on July 23, 2019. *Id.* The Star Mark appears below:



McGowan was Plaintiffs' Director of Finance and Operations. *Id.* ¶ 34. As such, McGowan was responsible for overseeing and accounting for donations, payroll, accounts receivable, and accounts payable. *Id.* He also had responsibilities within Human Resources, including approval of paid time off. *Id.* As an employee, McGowan executed an Agreement. *Id.* ¶ 34; Dkt. 15-3. Prior to the end of McGowan's employment and without Plaintiffs' authorization, McGowan manually overrode internal controls to add accrued leave time for himself, McGrath, Finnegan, and others, which time was worth approximately $14,000. *Id.* ¶ 36. Thereafter,

3

McGowan resigned, and his last day was March 17, 2023 – the day after ILA was incorporated. *Id.* ¶ 37. Despite the Agreement, McGowan retained and continues to retain possession of Plaintiffs' laptop computer. *Id.* ¶ 38. The laptop computer contains Plaintiffs' confidential information including information related to the legislator rating algorithm. *Id.* ¶ 39. To date, McGowan has not compensated Plaintiffs for the unauthorized PTO nor has he returned the laptop computer. *Id.* ¶ 40.

McGrath was employed as Plaintiffs' Director for the Center for Legislative Accountability. *Id.* ¶ 42. As the Director, McGrath directed the research and publication of Plaintiffs' ratings of state and federal lawmakers. *Id.* McGrath also executed an Agreement that included confidentiality and non-disclosure provisions. *Id.* ¶ 43; Dkt. 15-4. McGrath's last day of employment was March 14, 2023. Dkt. 15 ¶ 44.

Axler was employed as a Policy Analyst for the Center for Legislative Accountability. *Id.* ¶ 46. In that role, Axler was responsible for researching and summarizing state and federal legislation, including how legislators voted, for part of CPAC's ratings system. *Id.* Axler also executed an Agreement that included confidentiality and non-disclosure provisions. *Id.* ¶ 47; Dkt. 15-5. Axler's last day of employment was March 23, 2023. Dkt. 15 ¶ 48.

Reese was employed as the Policy Coordinator for the Center for Legislative Accountability. *Id.* ¶ 50. As the Policy Coordinator, Reese was responsible for researching legislation and legislator voting records, which information was then used as part of CPAC's ratings system. *Id.* ¶ 51. Reese also executed an Agreement that included confidentiality and non-disclosure provisions. *Id.* ¶ 52; Dkt. 15-6. Reese's last day of employment was March 23, 2023. Dkt. 15 ¶ 53.

Finnegan was employed as a Government Relations Associate. *Id.* ¶ 55. In that role, he was responsible for the statistics, data manipulation, and analytics that were used as part of CPAC's ratings system. *Id.* Finnegan also executed an Agreement that included confidentiality and non-disclosure provisions. *Id.* ¶ 56; Dkt. 15-7. Finnegan's last day of employment was March 14, 2023. Dkt. 15 ¶ 57.

McGowan, McGrath, Axler, Reese, and Finnegan all gave notice of their intent to resign in March of 2023. *Id.* ¶ 58. Shortly before, ILA was incorporated on March 16, 2023. *Id.* Plaintiffs allege, upon information and belief, that ILA was incorporated by McGowan, McGrath, Axler, Reese, and/or Finnegan. *Id.* ¶ 59.

Plaintiffs allege, upon information and belief, that McGowan, McGrath, Axler, Reese, and Finnegan are utilizing "Plaintiffs' confidential, proprietary and trade secret information for their own gain by forming ILA and directly competing with Plaintiffs." *Id.* ¶ 60. ILA, like Plaintiffs, rates state and federal legislators and issues "scorecards" based upon the legislator's voting history. *Id.* ¶ 61. McGowan remains in possession of Plaintiffs' laptop, which contains information related to Plaintiffs' ratings system. *Id.* ¶ 62. Plaintiffs allege, upon information and belief, that McGowan kept the laptop in order to access information related to the ratings system. *Id.* ¶ 63.

McGowan, McGrath, Axler, Reese, and Finnegan all note that they are Plaintiffs' former employees and advertise as such on ILA's website. *Id.* ¶ 64. According to ILA's website, McGowan is ILA's Chief Executive Officer ("CEO") and it notes that he "held the top finance position at American Conservative Union where he served for over 6 years." *Id.* ¶ 65. According to ILA's website, McGrath serves as ILA's President and his biography similarly notes his experience "leading the creation of the nation's first and only legislative scorecard program." *Id.* ¶ 66. Axler serves as ILA's Director of Policy Analysis where he "plays a critical role in managing

the review of policy and legislative procedure across the scorecard creation process." *Id.* ¶ 67. Reese serves as ILA's Director of Legislative Research and "directs the research processes for ILA's congressional and state scorecards." *Id.* ¶ 68. Finnegan "directs the ILA's data and analytics operations." *Id.* ¶ 69.

Plaintiffs allege, upon information and belief, that McGowan, McGrath, Axler, Reese, and Finnegan have utilized Plaintiffs' confidential information to establish ILA's lawmaker scorecard – the Limited Government Index. *Id.* ¶ 70. According to ILA's website, ILA "enlisted the original architects of the nation's first and only 50-state comprehensive scorecard produced at the American Conservative Union" and those "individuals are utilizing a decade of experience they each gained while building the ACU system to develop the new ultimate scorecard." *Id.* Plaintiffs allege that a review of ILA's website and publications "reveals that Plaintiffs' confidential, proprietary and trade secret information has been utilized without Plaintiffs' authorization." *Id.* ¶ 71.

On February 1, 2024, ILA published the "Soros Files" on its website. *Id.* ¶ 72. They were authored by Reese, and Plaintiffs allege that they "include false and defamatory statements regarding Plaintiffs." *Id.* ¶ 73; Dkt. 15-9. The Soros Files encompassed 33 articles and included the following statements:

- "It appears Zuckerberg coordinated with CPAC to help advance racial justice through arguably the most powerful tool in the nation for lobbying Republicans."

- "It is therefore not surprising why Soros, Zuckerberg and Arnold have so heavily invested in CPAC to control its scorecard."

- "John Arnold is one of those billionaires that has made significant investments into CPAC."

- "CPAC works to bring [John] Arnold's New York City's Cashless Bail Policy to Other States."

- "It appears that CPAC has become an important partner to [John] Arnold in advancing the bail elimination policies despite the crime they have been documented to cause. For example, CPAC has lobbied the Ohio legislature on enacting a 'bail reform' policy just like the one enacted in New York."

- "Meet CPAC Billionaire Funder George Soros."

- ". . . CPAC has at least two-Soros funded prosecutors on its staff."

Dkt. 15 ¶ 74; Dkt. 15-9.

Prior to ILA and Reese publishing the Soros Files, Plaintiffs had entered into an agreement with a substantial donor to be a key sponsor for various events during CPAC 2024. Dkt. 15 ¶ 75. Following publication of the Soros Files, the donor withdrew its sponsorship citing the Soros Files as the precipitating cause. *Id.*

ILA also adopted a logo displaying a star, which Plaintiffs allege is substantially similar to CPAC's mark and scorecard presentation. *Id.* ¶ 77. The ILA star logo is below:



*Id.* ¶ 78. Plaintiffs allege that the star logo, colors, and graphics have created confusion amongst legislators, who incorrectly believe that they are being recognized by CPAC and that Plaintiffs and ILA are related entities. *Id.* ¶ 79.

Plaintiffs cite two examples that they assert establish that the logo has caused confusion. *Id.* ¶ 80. In the first instance, Greg Vital of the Tennessee General Assembly tweeted that he was "honored to be recognized by CPAC Institute for Legislative Analysis" when he was referring to ILA. Dkt. 15-10. In the second instance, Missouri State Representative Doug Richey tweeted that he received "the 'Champion of Limited Government' recognition, from the ILA (they provide a deeper analysis related to the work of CPAC)." *Id.*

## B.  Procedural Background

On March 28, 2024, Plaintiffs filed their Complaint. Dkt. 1. The Defendants filed a Motion to Dismiss on April 22, 2024. Dkt. 11. In response, Plaintiffs filed an Amended Complaint. Dkt. 15.[4] Accordingly, the Court denied the Motion to Dismiss as Moot. Dkt. 15.

---

[4] Plaintiffs' Amended Complaint includes twenty-four counts, including: (i) an alleged violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, against the Individual Defendants; (ii) alleged violations of the Virginia Computer Crimes Act, Va. Code Ann. § 18.2-152.1, against the Individual Defendants and in particular McGowan; (iii) an alleged violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, against all Defendants; (iv) an alleged violation of the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336, against the Individual Defendants; (v) breach of fiduciary duty against the Individual Defendants; (vi) common law conversion against all Defendants and an additional count against McGowan; (vii) breach of contract against the Individual Defendants and an additional count against Reese; (viii) defamation *per se* against ILA and Reese; (ix) several civil conspiracy counts against various groups of Defendants; (x) trademark infringement, 15 U.S.C. § 1114, against ILA; (xi) false designation of origin, 15 U.S.C. § 1125, against ILA; (xii) five unjust enrichment counts against various Defendants; (xiii) two counts of tortious interference with economic relations against all Defendants; and (xiv) unfair competition against all Defendants.

On May 21, 2024, Defendants filed the currently pending Joint Motion to Dismiss. Dkt. 19. On June 4, 2024, Plaintiffs filed their Opposition. Dkt. 24. On June 10, 2024, Defendants filed their Reply in Support. Dkt. 25.

## II.  STANDARD OF REVIEW

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

### III. ANALYSIS

Defendants seek to dismiss the entire Amended Complaint. Dkt. 20. Plaintiffs oppose. Dkt. 24. Given the breadth of the Amended Complaint, the Court will separately analyze the Motion with respect to each asserted legal theory.

### A.    Computer Fraud and Abuse Act ("CFAA")

Although it is unclear from the Amended Complaint, briefing on the Motion makes clear that Plaintiffs' Computer Fraud and Abuse Act claim is premised on 18 U.S.C. § 1030(a)(2)(C). Dkt. 20 at 4. To state a civil claim under this provision, a plaintiff must allege that a defendant: (i) intentionally accessed a computer; (ii) without authorization or through exceeded authorized access; (iii) obtaining information from a protected computer; and (iv) resulting in a loss or damages during any one-year period of at least $5,000. *Good 'Nuff Garage, LLC v. McCulley*, 2022 WL 4485810, at *11 (E.D. Va. Sept. 26, 2022) (citing cases). In this context, "intentionally" means "knowingly performed an act, deliberately and willfully on purpose." *United States v. Spirito*, 36 F.4th 191, 210 (4th Cir. 2022). The Fourth Circuit has "literally and narrowly" construed "access[ing] a computer without authorization or exceed[ing] authorized access" to refer to "situations where an individual accesses a computer or information without permission." *WEC Carolina Energy Solutions LLC v. Miller*, 687 F.3d 199, 203 (4th Cir. 2012). Thus, the Fourth Circuit followed the Ninth Circuit's holding in *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009), where the Ninth Circuit found that employees had not violated this statute where "they retrieved confidential information via their company user accounts and transferred it to . . . a competitor and former employee." *WEC*, 687 F.3d at 203.

In applying this analytical framework to the claim presented here, the Court views it as necessary to separate the claim against McGowan as opposed to McGrath, Axler, Reese, and

Finnegan. This is for the simple reason that Plaintiffs allege that McGowan still has access to Plaintiffs' laptop. Dkt. 15 ¶ 62. With respect to McGrath, Axler, Reese, and Finnegan, Plaintiffs cannot premise any CFAA claim on access that they had while they were employed by Plaintiffs. *See WEC*, 687 F.3d at 203. Thus, Plaintiffs must premise any CFAA claim on post-employment access. But at best, Plaintiffs can only speculate as to any post-employment access and that McGrath, Axler, Reese, and Finnegan had such access via McGowan's retention of his work computer. Dkt. 15 ¶ 92. Plaintiffs' claims against McGrath, Axler, Reese, and Finnegan involve an impermissible linking of speculative suggestions that: (i) McGowan provided them with access to the retained laptop; (ii) each of them actually accessed the laptop; and (iii) each of their supposed accessing of the laptop caused damages. Plaintiffs cannot support any link in this paper chain. Other courts have similarly dismissed CFAA claims where a plaintiff has failed to adequately allege access. *See, e.g.*, *Pak v. Recio*, 2016 WL 4492812, at \*5 (E.D. Texas July 21, 2016) (recommending dismissal of CFAA claim where plaintiff speculated access). Moreover, this Court's analysis is consistent with its obligation under *Twombly* and *Iqbal*. *See Lemon v. Myers Bigel, PA*, 985 F.3d 392 (4th Cir. 2021) ("Speculation, of course, falls short of what *Twombly* and *Iqbal* require.").

The allegations against McGowan stand on perhaps slightly stronger footing, as Plaintiffs at least have alleged facts establishing that McGowan had a device – post-employment – to access. But Plaintiffs must rely on pure speculation to establish that McGowan *did* access the device post-employment. Dkt. 15 ¶ 92 (alleging access "upon information and belief"). Plaintiffs do not allege that their systems reflect that McGowan *actually* accessed any device post-employment. Nor can Plaintiffs establish that the nature of the information that McGowan allegedly accessed reveals that he must have accessed such information post-employment, because McGowan is alleged to

11

have had authorized access to information related to the alleged proprietary information prior to his resignation. Thus, here too, Plaintiffs' allegations require too great of an intuitive leap. *See, e.g.*, *Carter v. Va. Dep't of Game & Inland Fisheries*, 2018 WL 3614975, at \*9 (E.D. Va. July 27, 2018) (holding that allegations based on information and belief "veer away from supporting plausible inferences, and turn instead toward unsupportable conclusory talismanic statements"). Plaintiffs' CFAA claim against McGowan relies on the unsupported supposition that McGowan accessed the retained laptop after his employment ended and that it was *that* access, rather than any prior access during McGowan's employment, which resulted in damages to Plaintiffs. As district courts in this Circuit have recognized, post-*Twombly* and *Iqbal*, a complaint "is not a leap of faith," *Turner v. Va. Dep't of Med. Assist. Servs.*, 230 F. Supp. 3d 498, 510 (W.D. Va. 2017) and this Court "is not permitted to step in and make the necessary leaps to make certain that a plaintiff has properly pled his cause of action," *Parks v. Lowe*, 2010 WL 545679, at \*7 (W.D. Va. Feb. 12, 2010).

In sum, Plaintiffs have failed to plead a CFAA claim against any of the Individual Defendants. Plaintiffs' claim fails on two levels: (i) they have not plausibly alleged post-employment access to any protected device; and (ii) they have not plausibly alleged damages flowing from any supposed post-employment access rather than access during employment. Accordingly, Count I will be dismissed.

B.      Virgina Computer Crimes Act ("VCCA")

Much like a CFAA claim, to state a claim under the VCCA, a plaintiff must allege that a defendant: (i) used a computer or computer network; (ii) without authority; and (iii) either obtains property or services by false pretenses, embezzles, or commits larceny, or converts the property of another. *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 855 (E.D. Va. 2018).

12

Plaintiffs have asserted two claims under the VCCA: first, against all of the Individual Defendants based on their alleged post-employment access of the retained laptop; and second, against McGowan based on his use of his computer to manually override internal controls to add unearned paid time off for himself, McGrath, and Finnegan. The Count II VCCA claim fails for the same reasons that the Count I CFAA fails: Plaintiffs cannot establish post-employment access by the Individual Defendants of any computer or any damages flowing from that alleged access.

The Count III VCAA claim focuses on more detailed factual allegations as to McGowan. Namely, that McGowan, who had been entirely relieved of any responsibilities related to Human Resources, nonetheless accessed the computer system, overrode internal controls, and distributed $14,000 worth of unearned paid time off to himself, McGrath, and Finnegan. Dkt. 115 ¶¶ 34, 36. Under the VCCA, a person acts "without authority" when "he knows or reasonably should know that he has no right, agreement, or permission or acts in a manner knowingly exceeding such right, agreement, or permission." Va. Code Ann. § 18.2-152.2. As district judges in this District have recognized, a "plaintiff can state a claim under the VCAA . . . even when the defendant was authorized to access a computer network." *GMS Indus. Supply Inc. v. G & S Supple Inc., LLC*, 441 F. Supp. 3d 221, 236 (E.D. Va. 2020). Here, Plaintiffs have sufficiently alleged that McGowan acted "without authority" – which applies a different standard than the CFAA – when he allotted himself and others unaccrued paid time off. *See Carfax, Inc. v. Accu-Trade, LLC*, 2022 WL 657976, at *15 (E.D. Va. Mar. 4, 2022). Thus, at least for the purposes of this Motion, Plaintiffs have stated a claim under the VCCA as to McGowan.

In sum, Plaintiffs have failed to state a claim against the Individual Defendants under the VCCA premised on any post-employment access to any computer system. Plaintiffs' allegations in this regard are entirely speculative and Count II will be dismissed. On the other hand, Plaintiffs

13

have alleged that McGowan was without authority to use the computer system to allot himself and others unearned time off. Accordingly, the Motion will be denied with respect to Count III.

C.    The Defend Trade Secrets Act (the "DTSA")

The parties agree that to state a claim under the DTSA, a plaintiff must show that: (i) it owns a trade secret; (ii) the trade secret was misappropriated; and (iii) the trade secret implicates interstate or foreign commerce. *Bonumose Biochem, LLC v. Yi-Heng Percival Zhang et al.*, 2018 WL 10069553, *6 (W.D. Va. May 21, 2018); *Power Home Solar, LLC v. Sigora Solar, LLC*, 2021 WL 3856459, at *9 (W.D. Va. Aug. 30, 2021). Here, Defendants challenge the first and third elements of the DTSA claim.[5]

Defendants first challenge whether Plaintiffs have adequately pled the existence of a trade secret. A "trade secret" is "all forms and types of financial, business, scientific, technical, economic, or engineering information" that "the owner thereof has taken reasonable measures to keep such information secret" and which "derives independent economic value, actual or potential, from not being generally known." 18 U.S.C. § 1839(3). Although Plaintiffs may be able to allege facts sufficient to establish that their legislator rankings methodology constitutes a trade secret, the Court agrees with Defendants that Plaintiffs have not yet done so. Plaintiffs describe their alleged trade secrets as "their methods, methodologies, and algorithms" regarding their lawmaker rankings. Dkt. 15 ¶¶ 115-16. But these rankings are based on the lawmakers' publicly available voting records. *Id.* ¶ 21 (alleging that Plaintiffs "issue[] ratings of state and federal lawmakers across various policy areas based upon their voting records"). If the voting records are publicly

---

[5] With respect to the second element, a claim for misappropriation lies "simply by demonstrating that the defendant acquired [the] trade secret by improper means, even if the plaintiff cannot show use of that trade secret." *Sys. 4, Inc. v. Landis & Gyr, Inc.*, 8 F. App'x 196, 200 (4th Cir. 2001).

14

available and the rankings are publicly available, it is unclear to the Court how the ranking methodology is protected as a trade secret. The allegations at issue here regarding "methods, methodologies, and algorithms" mirror similar allegations that district judges in this Circuit and others have found insufficient to allege a trade secret.[6] Moreover, that Plaintiffs' compilation of the information relied upon to produce the rankings "was an arduous task is not alone sufficient to confer protection under the DTSA." *24 Seven, LLC v. Martinez*, 2021 WL 276654, at *8 (S.D.N.Y. Jan. 26, 2021); *Accenture LLP v. Trautman*, 2021 WL 6619331, at *9 (S.D.N.Y. June 8, 2021) (finding that a plaintiff's development of techniques insufficient because it does not distinguish such information from "mere knowledge of the intricacies of a business").[7]

Further, Plaintiffs' allegations regarding the second element of defining a trade secret – that the alleged trade secret derives "independent economic value" from not being known – are entirely conclusory. Dkt. 15 ¶¶ 121, 131, 135 (mirroring statutory language that "trade secret information derives independent economic value from not being generally known"). As the Supreme Court has instructed, such "[t]hreadbare recitals of the elements of a cause of action,

---

[6] *See Power Home Solar*, 2021 WL 3856459, at *9-10 (finding allegations regarding "proprietary practices, methods, techniques, and pricing models" constituted mere labels without description or explanation and noting that plaintiff failed to allege "why the underlying customer information is not otherwise readily ascertainable by their competitors in the relevant market"); *JTH Tax LLC v. Cortorreal*, 2024 WL 897605, at *6 (E.D. Va. Mar. 1, 2024) (dismissing DTSA claim where plaintiff alleged "client lists and files, methods of operations, private customer information, and marketing strategies" as the alleged trade secrets); *Lithero, LLC v. AstraZeneca Pharm. LP*, 2020 WL 4699041, at *2 (D. Del. Aug. 13, 2020) (dismissing DTSA claim where the complaint "points to large, general areas of information" without identifying "what about [the] process is a trade secret").

[7] The vague allegations regarding "methods, methodologies, and algorithms" makes it impossible for the Court to determine what information each or any Individual Defendant is alleged to have taken. For example, it is inherent in any meaningful ranking of legislators that an individual would have to review those legislators' votes on bills and introduction of legislation; but these "methods" of reviewing information would certainly not constitute a trade secret.

supported by mere conclusory statements, do not suffice" to state a claim. *Iqbal*, 556 U.S. at 678; *Broidy v. Global Risk Advisors, LLC*, 2023 WL 6258135, at *11 (S.D.N.Y. Sept. 26, 2023) (dismissing claim where "Plaintiffs allege in a conclusory, boilerplate manner that their trade secrets derive independent value from not being generally known or available" which "improperly recites the exact language" of the statute) (omitting internal quotation marks). Indeed, there are allegations in the Amended Complaint that would suggest that, to the extent the rankings methodology has value, it is not from its secrecy but from being "the nation's first and leading 50-state comprehensive scorecard." Dkt. 15 ¶ 30. Accordingly, the Court finds that, as the Amended Complaint currently stands, it has not alleged the existence of a trade secret.

Plaintiffs have also failed to allege facts demonstrating that their alleged trade secret implicates interstate or foreign commerce. In their Opposition, Plaintiffs argue that their alleged trade secret scorecard necessarily implicates interstate commerce because they rank state and federal lawmakers and legislation. Dkt. 24 at 9. But the fact that the lawmakers that Plaintiffs rank cross state bounds does not mean that the *commercial* aspect crosses state bounds. Based upon Plaintiffs' other allegations regarding the donations, it is apparent that Plaintiffs could add allegations to the Amended Complaint that would establish an interstate nexus. At this point, however, Plaintiffs have failed to do so and, so, Plaintiffs have also failed to state a claim on this basis. Accordingly, Plaintiffs' DTSA claim will be dismissed.

D.     The Virginia Uniform Trade Secrets Act (the "VUTSA")

As the parties recognize and this Court has previously held, the "applicable standards under the DTSA and . . . the VUTSA are nearly identical." *Apex Advanced Tech. LLC v. RMSI Private Ltd.*, 2022 WL 4826335, at *5 (E.D. Va. Sept. 30, 2022). Plaintiffs' VUTSA claims fail because Plaintiffs have failed to adequately plead facts establishing that their rankings methodology

constitutes a trade secret. Virginia law, as with the DTSA, requires that a trade secret "[d]erives independent economic value . . . from not being generally known and not being readily ascertainable by proper means." Va. Code Ann. § 59.1-336. Thus, Plaintiffs' failure to assert facts, which plausibly allege that their system "derives independent economic value" and is not "readily ascertainable" via publicly available information, means Plaintiffs have also failed to allege a VUTSA claim and it will be dismissed.

### E.    Breach of Fiduciary Duty

In Count VI, Plaintiffs allege that the Individual Defendants breached their fiduciary duty to Plaintiffs by: (i) upon information and belief, incorporating Defendant ILA while still employed by Plaintiffs; and (ii) by intentionally taking and misusing Plaintiffs' confidential information. Dkt. 15 ¶ 146. To state a claim for breach of fiduciary duty under Virginia law, a plaintiff must allege: (i) a fiduciary duty; (ii) a breach; and (iii) damages resulting from the breach. *NorthStar Aviation LLC v. Alberto*, 332 F. Supp. 3d 1007, 1016 (E.D. Va. 2018). The Court will address each alleged breach.

The Supreme Court of Virginia and district judges in this District have recognized that "an employee has the right to make arrangements during his employment to compete with his employer after resigning his post." *Williams v. Dominion Tech. P'ners, LLC*, 265 Va. 280, 289 (2003); *Contract Assocs., Inc. v. Atalay*, 2015 WL 1649051, at *4 (E.D. Va. Apr. 10, 2015) (granting summary judgment in favor of employee where employee made "arrangements in contemplation of future competition"). Here, Plaintiffs merely allege that Defendant ILA, upon information and belief, was incorporated in the days before the Individual Defendants left their employment. Plaintiffs do not allege that Defendant ILA was already competing immediately upon incorporation. Accordingly, the allegations in the Amended Complaint do not go beyond the

17

"arrangements" that the Supreme Court of Virginia has held do not support a breach of fiduciary duty claim.

With respect to the second alleged breach, Plaintiffs and Defendants first dispute whether the claim can properly be brought as a breach of fiduciary duty at all, or whether it is simply part of the breach of contract claim. The Court has little difficulty agreeing with Plaintiffs that the duty not to disclose trade secret information can form the basis for both a breach of a general fiduciary duty and a breach of the more specific contract regarding when and how to deal with such information. *See Combined Ins. Co. of Am. v. Wiest*, 578 F. Supp. 2d 822, 833 (W.D. Va. 2008) ("Stated succinctly, inasmuch as it is clear that Virginia law recognizes the tort of breach of fiduciary duties in the employment context, and inasmuch as it is clear that almost all employment relationships are founded on contract, it is abundantly clear that the Supreme Court of Virginia did not intend to render the two causes of action mutually exclusive."). This finding, however, does not resolve the matter. Plaintiffs' breach of fiduciary claim with respect to their alleged sharing of confidential information suffers a more fundamental flaw: Plaintiffs have failed to plausibly allege a breach. Although Plaintiffs make conclusory allegations that the Individual Defendants have taken Plaintiffs' confidential information, Plaintiffs have failed to plausibly allege: (i) that Defendant ILA's scorecard is the same as Plaintiffs' scorecard;[8] (ii) to what confidential

---

[8] In Count IX, which alleges a breach of contract and which allegations are *not* incorporated into this breach of fiduciary duty count, Plaintiffs allege in vague and conclusory fashion that the scorecards are "unequivocally the same." Dkt. 15 ¶ 163. But the Court is unable to test this allegation, because Plaintiffs never allege on what basis their scorecard system ranks legislators. *See Iqbal*, 556 U.S. at 678 (a court need not rely on mere conclusory allegations). Moreover, although the Court does not rest on this, the Court reviewed Plaintiffs' public facing website which asserts that the ratings are "the original Conservative Ratings" which would on its face appear to be different from ILA's "Limited Government Index." *Compare* CPAC Foundation, *Ratings available at* https://www.cpac.org/foundation/ratings (last visited February 5, 2025) *with* Dkt. 15 ¶ 70.

information each Individual Defendant had access; or (iii) how such information was used to benefit ILA and to Plaintiffs' detriment. As noted *supra*, the Amended Complaint does not allege what information was obtained or taken, by which Defendant, or even what that information included. Indeed, a review of the Amended Complaint suggests that certain Individual Defendants did not even have access to information that could be considered confidential.[9] Accordingly, the Court will grant the motion to dismiss the breach of fiduciary duty claim.

### F.    Conversion Claims

In Counts VII and VIII, Plaintiffs assert two common law conversion claims: first against all of the Defendants, and, second, against McGowan alone. As this Court has previously noted, conversion is "any distinct act of dominion wrongfully exerted over the property of another, and in the denial of his rights, or inconsistent therewith." *Vivos Acquisitions, LLC v. Health Care Res. Network, LLC*, 2022 WL 995389, at *6 (E.D. Va. Mar. 31, 2022).

The conversion claim in Count VII is premised on the Defendants' alleged use of Plaintiffs' "confidential, proprietary and trade secret information" as well as "other non-public information." Dkt. 15 ¶ 149. Defendants first argue that this claim is preempted by the VUTSA. The preemption provision of the VUTSA "displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret." Va. Code Ann.

---

[9] McGowan and McGrath appear to have had some role in the creation of the scorecard systems and, if such information constitutes a trade secret, appear to have had access. Conceivably, the allegations with respect to Finnegan could also be read to suggest that he had access to the relevant "methods, methodologies, and algorithms." Dkt. 15 ¶ 55 (alleging that Finnegan "was responsible for the statistics, data manipulation, and analytics"). But the allegations with respect to the other two Individual Defendants do not reveal that they would even have had access to information that would constitute a trade secret. *See* Dkt. 15 ¶ 25 (alleging Axler was responsible "for researching and summarizing state and federal legislation, including how legislators voted on various bills"); *id.* ¶ 51 (alleging Reese was "responsible for researching legislation and legislator voting records" which were later used as part of Plaintiffs' system).

§ 59.1-341. "In considering whether [claims] are preempted by the VUTSA, [courts have noted] that preemption only occurs where the common-law claims 'are premised entirely on a claim for the misappropriation of a trade secret.'" *Rogers Elec. of Va., Ltd. v. Sims*, 93 Va. Cir. 484 (2015). Judges in this District have "hesitate[d] to assign the label of 'VUTSA trade secret' to proprietary information at the pleading stage for fear of depriving parties the opportunity to conduct fact-finding on the issue." *Anderson v. Fluor Intercontinental, Inc.*, 2021 WL 837335, at *17 (E.D. Va. Jan. 4, 2021). Moreover, judges in this District have held that, "unless it can be clearly discerned that the information in question constitutes a trade secret, the Court cannot dismiss alternative theories of relief as preempted by the VUTSA." *Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co., Inc.*, 191 F. Supp. 2d 652, 659 (E.D. Va. 2002). Having succeeded in arguing that Plaintiffs have not plausibly alleged a trade secret, Defendants cannot now turn around and argue that the conversion claim is preempted by the VUTSA. Thus, at this stage, the Court finds that preemption is not a basis for dismissal of Count VII.

Next, Defendants argue that the conversion claim fails because conversion applies only to tangible property, with a limited exception where intangible property rights are merged with a document. Dkt. 20 at 13. Defendants are correct. As the Supreme Court of Virginia has noted: "To establish a conversion of intangibles, however, the plaintiff must have both a property interest in and 'be entitled to immediate possession' of the documented intangible property. For this reason, this Court has refused to recognize a conversion claim 'for interference with *undocumented* intangible property rights." *Mackey v. McDannald*, 298 Va. 645, 659 (2020) (such documented intangible property rights include a valid stock certificate, promissory note, or bond). Plaintiffs do not address *Mackey* and their citation to district court cases that reach a contrary conclusion are unpersuasive in the face of a clear decision from the Supreme Court of Virginia. Thus, the

conversion claim premised on Plaintiffs' alleged trade secret and other non-public information
fails because it is premised on intangible property.

Finally, even if *Mackey* did not apply, Plaintiffs' conversion claim would still fail under
the *Iqbal/Twombly* standard because it is unclear what has been converted. The Court has already
noted *supra* the deficiencies with respect to the descriptions of Plaintiffs' alleged trade secrets and,
to the extent Plaintiffs rely on their allegation of other "non-public information, this allegation is
similarly vague, conclusory, unhelpful. For all these reasons, Plaintiffs have failed to state a
conversion claim with respect to Count VII.

The Court next turns to the conversion claim in Count VIII. Here, the claim is premised
on McGowan's retention of Plaintiffs' laptop. The Court agrees that "the duty not to convert the
property of another for one's own purposes exists in the absence of any contract, and thus provides
the basis for an independent tort from the contract claims." *Wiest*, 578 F. Supp. 2d at 833
(internation quotations and citations omitted). Thus, the existence of a contract does not bar
Plaintiffs' conversion claim. Defendants argue that Plaintiffs' claim falters because Plaintiffs have
not alleged that Plaintiffs requested the return of the laptop and the absence of such an allegation
is fatal to the claim. The Court agrees. Although the Court could find no Virginia case directly
on point, a defendant who is originally authorized to possess certain property cannot be said to
"wrongfully exert" dominion over that property until the owner has demanded the return of the
property and been refused. Any other result would have individuals suing for conversion before
taking the simple step of requesting the return of their property, and this is not something that the
law (or the courts of the Commonwealth of Virginia) would want to encourage. Moreover, absent
a demand for the return of the laptop, McGowan's only knowledge that the property was required
to be returned arises from his Agreement and thus the conversion claim would not be independent

from the breach of contract claim. Thus, this Court finds that, where McGowan obtained the laptop lawfully, the omission of any allegation that Plaintiffs demanded the return of the laptop means that Plaintiffs have not plausibly alleged that McGowan wrongfully exercised ownership over the laptop. Moreover, this is a long-recognized principle that courts have applied in the context of conversion. *See, e.g.*, *Logan Cnty. Nat'l Bank v. Townsend*, 139 U.S. 67, 78 (1891) ("Until demand, the plaintiff had not manifested his will to have them restored to him. The conversion occurred when the defendant repudiated all obligation to perform the contract, or denied that any such contract was ever made, and yet held on to the bonds as its property."); *T&S Brass & Bronze Works, Inc. v. Pic-Air, Inc.*, 790 F.2d 1098, 1106 (4th Cir. 1986) ("The refusal to return a chattel upon the demand of the rightful owner is conversion."); *Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 53 (2d Cir.1993) ("When the original possession is lawful, 'conversion does not occur until the defendant refuses to return property after demand or until he sooner disposes of the property.'") (citation omitted); *In re Parker*, 653 B.R. 765, 776 (E.D. Va. 2023) ("It is well settled that 'where [a] defendant's original possession is not wrongful, conversion is complete when the rightful owner demands the return of the property and is refused.'"). Accordingly, Plaintiffs have also failed to state a claim for conversion in Count VIII.

G.    Breach of Contract

Plaintiffs also assert two breach of contract claims: (i) against the Individual Defendants for the alleged use of Plaintiffs' trade secret information (Count IX); and (ii) against Reese for breach of a non-disparagement clause (Count X). To state a breach of contract under Virginia law, a plaintiff must show: (i) a legally enforceable obligation of a defendant to a plaintiff; (ii) the defendant's violation of that obligation; and (iii) injury or damage to the plaintiff caused by the breach. *Filak v. George*, 267 Va. 612, 614 (2004).

22

With respect to the Individual Defendants, Plaintiffs assert that they breached the Agreements in two ways: (i) by utilizing Plaintiffs' alleged confidential, trade secret information to develop a competing ranking system; and (ii) upon information and belief, by disclosing the information to other employees of ILA. Dkt. 15 ¶¶ 163-64. Plaintiffs' first alleged breach fails for many of the reasons that this Court has already discussed. Plaintiffs have failed to allege sufficient facts to demonstrate that the rankings systems are similar, what information specifically was alleged to have been used, whether each Individual Defendant actually had access to material that would be considered protected and is not otherwise publicly available. Plaintiffs' second alleged breach with respect to the Individual Defendants also fails for the additional reason that the Amended Complaint's allegation that information has been shared with other employees is entirely speculative and has no facts to support it. Importantly, Plaintiffs have not even alleged that there *are* other employees of ILA.[10] Accordingly, Plaintiffs have failed to state a breach of contract claim against the Individual Defendants in Count IX.

With respect to Count X, Defendants argue that the non-disparagement clause is barred by the National Labor Relations Act, 29 U.S.C. § 157 (the "NLRA"). Both parties primarily cite to *Quicken Loans, Inc. v. NLRB*, 830 F.3d 542 (D.C. Cir. 2016), for instruction on how the NLRA, and in particular Section 7 of the NLRA, operate in this context. As the D.C. Circuit recognized, "Section 7 of the NLRA guarantees employees the right to self-organization" which "necessarily encompass employees' rights to communicate with one another and with third parties about

---

[10] The Court recognizes that there are circumstances where pleading information upon information and belief is appropriate. But here Plaintiffs' allegations appear to be pure speculation and lack any supporting facts to lend them weight. As the Fourth Circuit has instructed: "Although a plaintiff may initially plead parts of his case 'upon information and belief,' his allegations may not be wholly conclusory." *Kashdan v. George Mason Univ.*, 70 F.4th 694, 701 (4th Cir. 2023). Thus, where allegations "are far too speculative" and are "devoid of facts supporting the allegations that were pleaded upon information belief" dismissal is appropriate. *Id.* at 702.

*collective action and organizing a union.*" 830 F.3d at 544 (emphasis added). Thus, Section 7 protects employees' rights to discuss organization and to criticize and complain about their employer. *Id.* The primary difficulty that the Court has with Defendants' Section 7 argument is that Reese is not an employee – she is a former employee. *See* 29 U.S.C. § 152(3) (definition of "employee" limited to those who are current employees and those "whose work has ceased as a consequence of . . . any current labor dispute or because of any unfair labor practice"). Moreover, Reese is not accused of any disparagement that relates to collective action or unionizing. Although the Court agrees with Defendants that the Court has an obligation to determine whether a contract violates federal law before enforcing it, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83 (1982), the Court does not agree that Defendants have established that there is an NLRA violation here. Moreover, Defendants cite no cases where a district court, as a matter of original jurisdiction rather than on appeal from a decision of the National Labor Relations Board, has declined to enforce a non-disparagement clause against a former employee based on Section 7 of the NLRA.[11]

Nonetheless, the Court will dismiss Count X because Plaintiffs have failed to adequately allege a breach of the Agreement. Plaintiffs allege that Reese breached the non-disparagement clause of the Agreement by publishing the Soros Files articles and that there are at least "thirty (30) disparaging and defamatory incidents, in direct violation of the Agreement." Dkt. 15 ¶ 172.[12] This fails to put Reese on notice for what Plaintiffs view as a breach, because the Amended

---

[11] The Court does not intend its decision here to be a final pronouncement on this issue. But based upon the arguments and issues presented by the parties at this stage, the Court cannot say that the non-disparagement clause violates the NLRA such that it should not be enforced against Reese.

[12] The Amended Complaint refers to "incidents" rather than "statements." This phrasing leaves the Court perplexed, as the Court is unsure how an "incident" could violate a non-disparagement clause.

Complaint only specifically identifies seven of these alleged thirty "incidents." *Id.* ¶ 74 (identifying seven alleged defamatory statements). Further, Plaintiffs do not explain how the statements are defamatory. For example, Plaintiffs do not explain how helping to "advance racial justice" is disparaging. *Id.* ¶ 74(a). Accordingly, Count X will be dismissed on this basis.

<h4 style="text-align:center">H.    Defamation *Per Se*</h4>

In Count XI, Plaintiffs allege that Defendants ILA and Reese are jointly and severally liable for defamation *per se* for the alleged defamatory statements in the Soros Files, including that "Plaintiffs are directly funded by Mark Zuckerberg, George Soros, and John Arnold and otherwise accuse Plaintiffs of allowing donations to influence the results of Plaintiffs' scorecards." Dkt. 15 ¶ 180.[13] To state a claim for defamation under Virginia law, a plaintiff must plead three elements: (i) publication; (ii) of an actionable statement; and (iii) with the requisite intent. *Va. Citizens Defense League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018). To be actionable, a statement must be both false and defamatory; that is, they must "injure one's reputation in the common estimation of mankind, to throw contumely, shame or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt." *Id.* Within that category of defamation, the Supreme Court of Virginia has recognized that certain words can constitute defamation *per se*: (i) those which impute to a person some serious crime involving moral turpitude; (ii) those which impute to a person a contagious disease; (iii) those which impute to a person unfitness to perform the duties of an office

---

[13] As an initial matter, the Court notes that none of the alleged defamatory statements refer to Plaintiffs ACU or ACUF; rather, the statements refer to CPAC. Plaintiffs have defined CPAC as a conference that they host. *See* Dkt. 15 ¶ 21 (alleging "Plaintiffs jointly host the Conservative Political Action Conference ('CPAC')"). Although the Court understands that CPAC may be understood to refer to Plaintiffs, there are no allegations to support that inference and Plaintiffs do not explain why statements regarding "CPAC" should be understood by the Court and by the public to be defamatory as to Plaintiffs. The Court makes no findings with respect to this observation now, as it was raised by the Court and not the parties, but in briefs on any future dispositive motions the parties should address it.

or employment; and (iv) those which prejudice such person in his or her profession or trade. *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713 (2006).

To begin with, Plaintiffs have not articulated how the alleged defamatory statements constitute defamation *per se*. Plaintiffs appear to be proceeding under the fourth category of defamation *per se*, that is, defamation that impacts a profession, trade, or business. But, as the Supreme Court of Virginia has noted, "[t]hat a defamatory statement may have had an adverse impact upon a plaintiff's work does not make that statement per se defamatory where the defamation is not 'necessarily hurtful' to the plaintiff's business and does not touch upon the plaintiff in his special trade or occupation." *Fleming v. Moore*, 221 Va. 884, 890 (1981). Indeed, in *Fleming*, the Supreme Court of Virginia noted with approval decisions from other jurisdictions holding that an accusation that a former ambassador was a Communist did not constitute defamation *per se*. *Id.* at 891 (citing with approval *Korry v. Int'l Tel. & Telegraph Corp.*, 444 F. Supp. 193, 196 (S.D.N.Y. 1978)). Thus, applying *Fleming* here, the Court finds that most of the alleged defamatory statements are not defamatory *per se* as they merely allege an association between Plaintiffs and certain influential persons and causes (namely, Mark Zuckerberg, George Soros, and John Arnold). *See* Dkt. 15 ¶¶ 74(a), 74(c), 74(d), 74(e), 74(f), 74(g). Plaintiffs have not explained how those alleged statements are "necessarily hurtful" to their business. Other courts, applying similar state laws, have held that similar claims are not defamatory. *See Harvey v. CNN, Inc.*, 520 F. Supp. 3d 693, 716 (D. Md. 2021) (dismissing claim where "Harvey does not even attempt to articulate *why* connecting him to the Nunes' investigation related to Biden would expose him to public scorn") (emphasis in original); *Guilford Trans. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. Ct. App. 2000) ("[Defamation] necessarily, however, involves the idea of disgrace; and while a statement that a person is a Republican may very possibly arouse adverse

feelings against him in the mind of many Democrats, and even diminish him in their esteem, it cannot be found in itself to be defamatory . . . ."). The statement that comes the closest to an allegation of defamation *per se* is the allegation that "Soros, Zuckerberg and Arnold have so heavily invested in CPAC to control its scorecard." Dkt. 15 ¶ 74(b). But even there, the statement is not that those individuals *do* control the scorecard, rather the statements ascribe a motive as to *why* those individuals would want to contribute to CPAC.

In addition to finding that Plaintiffs have not established that the seven identified statements constitute defamation *per se*, the Court also finds that Plaintiffs have failed to plead that the statements are defamatory. As courts recognize, Plaintiffs "cannot argue that merely being associated with" certain interests is defamatory. *See, e.g.*, *Deripaska v. Assoc. Press*, 282 F. Supp. 3d 133, 149 (D.C. 2017) (dismissing defamation claim premised on allegation that plaintiff was associated with the interests of the Russian government). Plaintiffs do not allege that association with Zuckerberg, Soros, or Arnold "injure[s] one's reputation in the common estimation of mankind." *Va. Citizens*, 910 F.3d at 783. Accordingly, at this stage, Plaintiffs have failed to state a claim in Count XI.[14]

## I.    Civil Conspiracy

In Counts XII through XIV, Plaintiffs allege three civil conspiracy claims: (i) against all Defendants premised upon the creation of Defendant ILA; (ii) against all Defendants premised on the Soros Files; and (iii) against McGowan, McGrath, and Finnegan premised on the unauthorized

---

[14] Defendants also argue that the defamation claim fails because Plaintiffs have not alleged actual malice. Here, Plaintiffs have alleged that Reese knew the statements in the Soros Files were false based on her work with Plaintiffs. Dkt. 15 ¶¶ 13, 180-185. This is sufficient to establish actual malice. *Malone v. WP Co., LLC*, 2023 WL 6447311, at *5 (W.D. Va. Sept. 29, 2023) ("At the motion to dismiss stage, this means that a plaintiff must plead enough facts to 'suggest' that a defendant 'knew [its] statements were false or that they were reckless with respect to their veracity.'")

overtime. To state a claim for conspiracy, a plaintiff must show "1) an agreement between two or more persons; 2) to participate in an unlawful act, or a lawful act in an unlawful manner; 3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and 4) that the overt act was done pursuant to and in furtherance of the common scheme." *Flexible Bens. Council v. Feltman*, 2008 WL 2465457, at *9 (E.D. Va. June 16, 2008). As Virginia courts have recognized, where "there is no actionable claim for the underlying alleged wrong, there can be no action for civil conspiracy based on that wrong." *Citizens for Fauquier County v. SPR Corp.*, 37 Va. Cir. 44, 50 (1995).

Here, each of Plaintiffs' conspiracy claims fails on the same two elements. First, Plaintiffs' conspiracy claims fail because Plaintiffs have failed to adequately allege the predicate torts on which they rest. As this Court has already discussed, Plaintiffs' claims related to misappropriation of trade secrets, defamation, conversion, and violations of the VCCA fail as alleged. Second, Plaintiffs have failed to adequately allege conspiratorial agreement. Plaintiffs allege a conspiracy in only the most conclusory terms. *See Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499–500 (E.D. Va. 2003) (stating to that to survive a motion to dismiss on common law civil conspiracy, plaintiff must plead agreement in more than mere conclusory language because "a conspiracy claim asserted in mere conclusory language is based on inferences that are not fairly or justly drawn from the facts alleged"); *Johnson v. Kaugars*, 14 Va. Cir. 172, 176 (Va. Cir. 1988) ("[I]t is not enough merely to state that a conspiracy took place."). Although Plaintiffs suspect a conspiracy, their allegations constitute no more than parallel conduct and a bare assertion of a conspiracy; the Fourth Circuit has held that such cursory allegations do not suffice. *See A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation

28

of agreement at some unidentified point does not supply facts adequate to show illegality."). Accordingly, Plaintiffs have failed to state a claim in Counts XII, XIII, and XIV.

### J.    Trademark Infringement

Plaintiffs next allege that Defendant ILA has infringed on its registered Star Mark. To state a claim for trademark infringement, a plaintiff must allege that (1) it possesses the mark; (2) that the defendant used the mark, (3) that the defendant's use of the mark occurred in commerce; (4) that the defendant used the mark in connection with the sale, distribution, or advertising of goods and services; and, (5) that the defendant used the mark in a manner likely to confuse consumers. *See LBLA Beauty, LLC v. 11177753 Canada Corp.*, 2024 WL 555888 (E.D. Va. Feb. 12, 2024). Here, the parties' arguments focus primarily on the second and fifth elements.

Here, Plaintiffs' arguments plainly fail. Defendant ILA has not used Plaintiffs' mark nor is Defendant's mark likely to create market confusion. The marks look nothing alike.[15] Defendant's mark uses color; Plaintiffs' mark does not. Defendant's mark includes a building; Plaintiffs' mark does not. Plaintiffs' mark includes words; Defendant's mark does not. The only *potential* similarly is the use of a star – but even then, it is not the same kind of star:

  

As courts recognize, where marks are so plainly dissimilar there is no possibility of confusion. *See Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir. 1984) (finding no error

---

[15] To the extent Plaintiffs attempt to expand their claim to include "material with similar colors and graphics," that claim is entirely conclusory and vague. Dkt. 24 at 26 n.22.

in the district court's conclusion "that the labels of the two wine bottles were so dissimilar as to rule out any possibility of confusion"); *Mintz v. Subaru of America, Inc.*, 716 Fed. Appx. 618, 620 (9th Cir. 2017) (dismissing infringement claims for dissimilar marks "Share the Love" and "A World of Love, for You and Those You Love"); *Marvel Enters., Inc. v. NCSoft Corp.*, 2005 WL 878090, at *4 (C.D. Cal. Mar. 9, 2005) ("That the terms at question here [(the word mark STATESMAN and the registered mark CAPTAIN AMERICA)] are entirely dissimilar is self-evident."); *Southgate v. Facebook, Inc.*, 2017 WL 6759867, at *3 (E.D. Va. Nov. 14, 2017) ("Most importantly, the Complaint fails to allege facts that make plausible that Defendants have used his Marks, or if they have, that there is any threat of confusion by the consuming public.").

In particular, U.S. District Judge Anthony J. Trenga's decision in the *Southgate* case bears discussion here. In *Southgate*, the only potential similarities between the two marks were the use of a star (although, like here, not the same kind of star) and the use of some of the same colors. 2017 WL 6759867, at *3. Judge Trenga found that the use of a star and sharing of a color were not sufficient to plausibly claim that the defendant used the plaintiff's mark or that there was a likelihood of confusion. Similarly, here, the only possible similarity between the two marks is the use of a star, but no one could claim that the two stars look alike where one is an incomplete star with no fill in the center while the other is a completed and filled star.

Plaintiffs argue that there has been actual confusion and point to two tweets by lawmakers. Dkt. 15-9. The tweet by Missouri State Representative Doug Richey does not reveal any confusion at all. *Id.* Indeed, Representative Richey posts that he received a recognition "from the ILA" and then distinguishes that recognition from the ratings provided by Plaintiffs by stating "they provide a deeper analysis" than Plaintiffs. *Id.* This does not reflect any confusion on the part of Representative Richey. The second tweet, by Tennessee State Representative Greg Vital does

reflect some confusion. *Id.* But it is not clear that such confusion is related to the mark. Moreover, a single example of confusion is *de minimis. See George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 399-400 (4th Cir. 2009) (finding that four instances of consumer confusion over two years was "at best *de minimis*" and weighed against a likelihood of confusion; affirming grant of summary judgment in favor of defendant); *Worsham Sprinkler Co. v. Wes Worsham Fire Prot., LLC*, 419 F. Supp. 2d 861, 883-84 (E.D. Va. 2006) (a few instances of actual confusion within an eight-month period "must be considered de minimis"). Accordingly, Plaintiffs have failed to plausibly allege a claim of trademark infringement.

Moreover, the elements of a false designation of origin and an unfair competition claim are essentially the same as the trademark infringement claims. *See Nationstar Mortg., LLC v. Ahmad*, 155 F. Supp. 3d 585, 592 (E.D. Va. 2015) (the elements of "unfair competition and false designation of origin are essentially the same as the elements for a claim of infringement of a registered trademark"). Thus, Plaintiffs did not separately address those claims. Dkt. 24 at 25-26. Accordingly, Counts XVI and XXIV fail for the same reason as the trademark infringement claim.

### K.    Unjust Enrichment

Plaintiffs assert five claims of unjust enrichment in the alternative against various groupings of the Defendants: (i) Count XVII is against all Defendants based on the use of Plaintiffs' alleged trade secret information; (ii) Count XVIII is against all of the Individual Defendants based on the same alleged use of trade secret information;[16] (iii) Count XIX is against all of the Individual Defendants based on the alleged disparaging statements made in violation of the Agreements; (iv) Count XX is against McGowan based on the failure to return the laptop; and (v) Count XXI is against McGowan, McGrath, and Finnegan based on the unearned paid time off.

---

[16] Counts XVII and XVIII essentially appear to be two counts covering the same conduct.

The fundamental problem with most, if not all of Plaintiffs' unjust enrichment theory claims, is that Plaintiffs cannot save their breach of contract claims by simply relabeling them as unjust enrichment.    Here, *even in counts related solely to unjust enrichment*, Plaintiffs affirmatively plead that their claims are a breach of contract.    Dkt. 15 ¶ 234 (alleging, in unjust enrichment count, that Defendants "breached their respective agreements with Plaintiffs"); *id.* ¶ 243 (alleging, in unjust enrichment count, that, "[a]s a result of Defendants['] . . . breach of contract, [Defendants] have been unjustly enriched"); *id.* ¶ 245 (alleging, in unjust enrichment count, that McGowan was "required to return all of Plaintiffs' property as set forth in his Agreement").[17]  Courts in this District, applying Virginia law, have recognized that a plaintiff may plead breach of contract and unjust enrichment claims in the alternative "only in the absence of an enforceable contract." *Colonna's Shipyard, Inc. v. Coastal Cement Corp.*, 2023 WL 3321734, at *3 (E.D. Va. May 9, 2023) (collecting cases).  Here, no one has disputed that there are enforceable contracts; rather, Defendants only dispute whether the contracts have been breached.  It appears to the Court that all of the unjust enrichment claims except for Count XXI would be subject to dismissal because they are covered by a contract.

The Supreme Court of Virginia has generally adopted a three-part test to establish an unjust enrichment claim: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value." *James G. Davis Constr. Corp. v. FTJ, Inc.*, 298 Va. 582, 597 (2020).  For the reasons stated previously with respect to the claims related to the alleged trade secrets and alleged disparagement, Plaintiffs have failed to allege

---

[17] Interesting, the failure to return the laptop is not the basis of any breach of contract claim against McGowan.

adequate facts demonstrating that Plaintiffs conferred a benefit on Defendants or that Defendants accepted or retained such a benefit. Similarly, there is no allegation separate and apart from the contract that would establish that Plaintiffs conferred any benefit on McGowan through the laptop. Importantly, there are no allegations that Plaintiffs purchased the laptop, the value of the laptop (as opposed to the information on the laptop), or when and in what circumstances McGowan was given the laptop.

Count XXI stands in somewhat different circumstances, but only with respect to McGowan. In this regard, Plaintiffs have alleged that Plaintiffs conferred a benefit on McGowan by means of unearned paid time off, that such time has value, that McGowan knew it was unearned, and that McGowan retained the benefit of that unearned paid time off. This is sufficient to state a claim against McGowan. There are no allegations with respect to Finnegan's or McGrath's knowledge regarding this allegedly unearned paid time off. Thus, although Plaintiffs have alleged that they conferred a benefit on Finnegan and McGrath, Plaintiffs have failed to allege facts demonstrating that those Defendants knew and should have expected to pay for that time off. Accordingly, Plaintiffs have stated an unjust enrichment claim only with respect to McGowan.[18]

  L. Tortious Interference with Economic Relations and an Existing Contract

Plaintiffs' last remaining claims are that all Defendants tortiously interfered with: (i) "economic relations with [Plaintiffs'] donors, customers, and clients"; and (ii) a contract between Plaintiffs and a substantial donor for sponsorship of a series of events. Dkt. 15 ¶¶ 258, 261, 267. It is well-settled that, in Virgina, to establish a claim for tortious interference with a contract, a

---

[18] The Court notes that Plaintiffs' argument in the Opposition Brief regarding the unjust enrichment claim does not separately address the five individual claims and merely argues in conclusory terms that they have satisfied the elements of an unjust enrichment claim. Dkt. 24 at 28.

plaintiff must allege: (i) the existence of a valid contractual relationship; (ii) knowledge of that contractual relationship on the part of the interferor; (iii) intentional interference inducing or causing a breach or termination of the relationship; and (iv) resultant damage to the plaintiff. *Lightfoot v. Richmond Pub. Schs.*, 2017 WL 3476224, at *3 (E.D. Va. Aug. 11, 2017). Tortious interference essentially requires that Plaintiffs allege the same elements, except that Plaintiffs must show "the existence of a business relationship or expectancy" and "a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy." *Glass v. Glass*, 228 Va. 39, 51-52 (1984).

To begin with, Plaintiffs' tortious interference claims fail because they are inextricably linked with Plaintiffs' defamation claims (both are premised on the defamatory nature of the Soros Files) which this Court has already dismissed. Dkt. 15 ¶¶ 260, 271 (linking withdrawal of donors to the Soros files); *see Lokhova v. Halper*, 441 F. Supp. 3d 238, 265 (E.D. Va. 2020) ("Lokhova's tortious interference claim is effectively duplicative of her defamation claim."). Next, the claims fail because Plaintiffs have failed to identify any specifics about the expectancy or contract with which Defendants allegedly interfered. *See, e.g.*, *Sandhir v. Little*, 2019 WL 1375595, at *9 (N.D. W. Va. Jan. 23, 2019) (finding that plaintiff failed to meet *Twombly* and *Iqbal* pleading standard where the plaintiff failed to allege details about the business relationship). As judges within this District recognize, a plaintiff must plead a *specific* expectancy or contract. *GEICO v. Google, Inc.*, 330 F. Supp. 2d 700, 705 (E.D. Va. 2004). Although Plaintiffs have alleged the existence of a contract, the references to an unspecified donor leave Defendants and the Court without information as to with whom Defendants are alleged to have interfered. This leads to the next issue with Plaintiffs' pleadings, that is, Plaintiffs have failed to plead knowledge of the specific contract or expectancy on the part of Defendants. This is especially true where the Individual

Defendants are alleged to have left Plaintiffs in March 2023 and the withdrawal by the unidentified donors is alleged to have occurred in February 2024.  There are no allegations from which the Court can infer that the Individual Defendants would have had knowledge of those expectancies or that contract at the time they left Plaintiffs' employment.  Plaintiffs essentially concede that they have failed to allege this element in conclusory terms. Dkt. 24 at 30 (asserting that they pled the elements of a tortious interference claim).  But pleading mere elements of a claim are insufficient to satisfy *Iqbal* and *Twombly*. *See, e.g.*, *Lokhova*, 441 F. Supp. 3d at 265 (dismissing tortious interference claim where "[a]part from vague and conclusory language" the complaint failed to plead that any defendant "was aware of any specific contracts").  Accordingly, the Court will grant the motion to dismiss with respect to Counts XXII and XXIII.

M.      Supplemental Jurisdiction

After resolving all of the arguments regarding the merits of the Motion to Dismiss, the Court has dismissed all of the federal claims.  All that remains are two state law claims (Count III and part of Count XXI).  Thus, the Court must now determine whether it will exercise supplemental jurisdiction over those remaining claims.[19]

Section 1367(a) of Title 28 of the United States Code provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  A court may, however, decline to exercise supplemental jurisdiction when, such as the present case, "the district court has dismissed

---

[19] The parties are not completely diverse as Plaintiffs and Axler are alleged to reside in Alexandria, Virginia.  Moreover, the damages associated with Count III and Count XXI against McGowan are alleged to be approximately $14,362.79.  Accordingly, the remaining claims also do not allege damages in excess of $75,000.

all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). When claims are dismissed in the early stages of the litigation, the "values of judicial economy, convenience, fairness, and comity" weigh in favor of dismissing the remaining state law claims. *Alston v. Anderson*, 2023 WL 416197, at \*7 (E.D. Va. Jan. 25, 2023). Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and will dismiss those claims on that basis.

## IV.    CONCLUSION

In sum, the Court will dismiss the Amended Complaint because Plaintiffs have failed to state a claim with respect to all but two state law claims and, with respect to those two state law claims, the Court will decline to exercise supplemental jurisdiction. The parties, however, did not discuss amendment or whether it is futile for Plaintiffs to amend. Although Plaintiffs have previously amended in light of a motion to dismiss by Defendants, this is the first time that Plaintiffs have the benefit of the Court's determinations as to their claims. Because the Court cannot say on this record that it would be futile for Plaintiffs to amend, the Court will grant Plaintiffs one opportunity to file an Amended Complaint.

Accordingly, it is hereby ORDERED that the Motion to Dismiss (Dkt. 19) is GRANTED IN PART and DENIED IN PART. The Motion is granted with respect to Counts I, II, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX, XII, XXIII, and granted in part with respect to Count XXI as it pertains to Defendants McGrath and Finnegan. The Motion is denied with respect to Counts III and XXI as it pertains to Defendant McGowan; and it is

FURTHER ORDERED that the Court DECLINES to exercise supplemental jurisdiction over Counts III and XXI; and it is

FURTHER ORDERED that the Amended Complaint (Dkt. 15) is DISMISSED WITHOUT PREJUDICE; and it is

FURTHER ORDERED that, if Plaintiffs wish to file an amended complaint, Plaintiffs must do so by March 3, 2025. If Plaintiffs fail to file an amended complaint by that date, then the Court will direct the Clerk to close this civil action.

It is SO ORDERED.

Alexandria, Virginia
February 13, 2025

_____/s/_____
Rossie D. Alston, Jr.
United States District Judge

37